**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SHEILA M. KYLE,**

                              **Plaintiff,**                    **5:05-CV-1361**
          **vs.**                                                          **(NAM/DRH)**

**COMMISSIONER OF SOCIAL SECURITY,**

                    **Defendant.**
_____

**APPEARANCES:**                                          **OF COUNSEL:**

Hinman, Howard & Kattell, LLP                Eugene D. Faughnan, Esq.
P.O. Box 5250
80 Exchange Street
700 Security Mutual Building
Binghamton, New York 13902
_Attorney for Plaintiff_


Andrew T. Baxter                                   William H. Pease, Esq.
Acting United States Attorney for the      Assistant United States Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261-7198
and
Office of General Counsel                        Barbara L. Spivak, Esq.
Social Security Administration                 Chief Counsel, Region II
26 Federal Plaza
New York, New York 10278                     Gina Shin, Esq.
_Attorneys for Defendant_                         Assistant Regional Counsel

**Norman A. Mordue, Chief U.S. District Judge:**

                    **MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

          Plaintiff Sheila M. Kyle brings the above-captioned action pursuant to 42 U.S.C. § 405(g)

and 1383(c)(3) of the Social Security Act, seeking review of the Commissioner of Social

Security's decision to deny her application for disability insurance benefits ("DIB").  The Court, having considered plaintiff's contentions and the entire administrative record, finds that the Commissioner's determination of non-disability was supported by substantial evidence.

## II.    BACKGROUND

Plaintiff was born in 1950; at the time of the administrative hearing in this matter held on April 14, 2005, plaintiff was fifty-four years old.  Administrative Transcript at pp. 68, 197.[1] Plaintiff lives with her husband.  AT 197.  She has a college degree and worked for approximately fifteen years as a middle school art teacher.  AT 66, 72, 197.

In June of 1991, plaintiff participated in a theater group.  AT 83, 144, 174.  As part of her costume, she wore a heavy headpiece, which caused her neck and shoulder pain.  AT 84, 144, 174.  She used "very little pain medication," but "pray[ed]" that the pain would lessen.  AT 84. In 1992, she sustained a whiplash-type injury due to a motor vehicle accident.  AT 84, 144, 174. Plaintiff claimed that as a result of the accident, she developed "intolerable" pain in her arms, lower back, and legs.  AT 84.  She treated her injuries with medication, heat, and ice packs.  *Id.*

On December 4, 2000, an MRI of plaintiff's cervical spine showed spondylotic disease at C4-5, C5-6, and C6-7.  AT 124, 171.  On January 2, 2002, an anterior cervical discectomy at C4-5, C5-6, and C6-7 with allograft fusion and placement of an anterior cervical plate was performed by Dr. Jon Weingart.  AT 121-22.  Dr. Weingart noted that the anterior cervical plate was placed "without difficulty.  There was excellent fixation of all screws . . . [and] the plate [was] in good position."  AT 122.  During a follow-up visit on February 28, 2002, Dr. Weingart noted that plaintiff "is doing well.  She has noticed an improvement in her pain."  AT 117.  During an examination, plaintiff showed good strength.  *Id.*  The plate and grafts were in good position.  *Id.*

---

[1] Portions of the administrative transcript, Dkt. No. 4, filed by the Commissioner together with his answer, will be cited herein as "AT __."

As of November 17, 2003, plaintiff treated with Dr. Ann R. Costello,[2] who plaintiff described as a "general practitioner."[3]   AT 61, 169.  Dr. Costello's progress notes reflect that plaintiff initially complained of, *inter alia*, a back injury, pain, muscle spasms, periodic vertigo, numbness in her fingers, feelings of hopelessness, and suicidal dreams.  AT 167-69.  However, it was noted that plaintiff was not suicidal, was planning to return to therapy, and was able to walk and cook dinner on the weekend.  *Id.*  She was diagnosed as suffering from chronic pain and depression, and prescribed Effexor.[4]  *Id.*  She also later complained of difficulty sleeping and was prescribed Restoril.[5]  AT 165.

During this time, it was also noted that plaintiff's principal allowed plaintiff to work a reduced schedule and allowed other accommodations, such as the use of a "special chair," and had other staff members perform lifting and "arranging" for plaintiff.  AT 168, 179; *see* AT 66.  Nevertheless, plaintiff was eventually unable to drive herself to and from work and stopped working on February 15, 2004.[6]  AT 66, 168, 179.

Dr. Costello's subsequent progress notes suggest that plaintiff's condition generally improved.  *See* AT 166, 168.  On July 30, 2004, it was noted that plaintiff had stopped taking muscle relaxants, reduced her usage of pain medications, felt that her condition had improved, and noted that her depression was "much better."  AT 166.  On November 8, 2004, it was noted

---

[2]  Forms on which Dr. Ann Costello wrote some of the progress notes state Dr. Ann Costello's name, as well as the name of Dr. John E. Costello.  AT 158, 160, 163, 165, 167, 169.  As plaintiff specified that she treated with Dr. Ann Costello, *see* AT 83, 88, 115, all references herein are to Dr. Ann Costello.

[3]  The report of the December 2000 MRI, however, suggests that plaintiff may have been treating with Dr. Costello at that time, as Dr. Costello is named as the "Ordering Physician."  AT 170-71.

[4]  Effexor is an antidepressant.  *Physicians' Desk Reference* 3411 (61st ed. 2007) (hereinafter "*PDR*").

[5]  Restoril is used for the short-term treatment of insomnia.  *PDR* at 1860.

[6]  Plaintiff, however, reported elsewhere in the record that she stopped working on November 15, 2004.  AT 116.

that plaintiff "feels good on Effexor." AT 162. Plaintiff's dosage of Effexor was increased "for a short period of time" on December 8, 2004, but it was noted that plaintiff's father died recently. *Id.* The progress notes also reflect that plaintiff walked one mile every day; took trips, including one which involved a "long" car drive and sleeping on a futon; and was planning future trips to Canada and Rome. AT 162, 165-66.

On January 28, 2005, plaintiff reported experiencing chronic pain in her arms, back, hips, legs, neck, and shoulders, but she also stated that she walked daily for exercise and that her depression was "better." AT 158. Dr. Costello noted that plaintiff "feels very good," is "happy" for the first time in five to six years, walks twice a day, and is able to sleep through the night. AT 159. She also noted that plaintiff wanted to cut back on pain medications, that she is pain-free for hours at a time, and that plaintiff's counselor feels that she is doing well. *Id.* A physical examination revealed a normal neck and joints. AT 160. Dr. Costello diagnosed plaintiff as suffering from, *inter alia*, chronic pain syndrome, neck pain, and depression. AT 161. She continued prescribing OxyContin but noted that plaintiff should try to decrease her use of OxyIR.[7] *Id.*

On March 22, 2005, Dr. Costello completed an assessment of plaintiff's ability to perform work-related physical activities. AT 173-79. She opined that plaintiff is unable to lift or carry any weight; should stand, walk, or sit as little as possible; and should never perform postural activities. AT 173-76. She also opined that plaintiff is able to reach, push, pull, and handle, but the activities "cause increased pain;" and that plaintiff had several environmental restrictions. AT 177-78. Dr. Costello concluded that plaintiff "will never be able to work again." AT 179.

In the interim, on August 4, 2004, plaintiff was examined at the request of the

---

[7] Oxycontin and OxyIR, also known as Oxycodone, are narcotic pain relievers. *PDR* at 2703, 2708.

Commissioner by Karl Buekers, M.D. AT 144-48. Dr. Buekers found that plaintiff was in no acute distress. AT 145. Plaintiff's cervical spine flexion, extension, and lateral flexion were twenty degrees and rotary movement was twenty-five degrees. AT 146. However, plaintiff's thoracic spine was normal and her lumbar spine showed full flexion, extension, lateral flexion, and full rotary movement bilaterally. *Id.* Full ranges-of-motion were seen in plaintiff's shoulders, elbows, forearms, and wrists bilaterally, as well as her hips, knees, and ankles bilaterally. *Id.* Plaintiff's strength was 5/5 in the upper and lower extremities and there was no redness, heat, swelling, or effusion. *Id.* Plaintiff's hand and finger dexterity were intact and her grip strength was 5/5 bilaterally. AT 147. Dr. Buekers diagnosed plaintiff as suffering from (1) post-traumatic intervertebral and osteoarthritic disease of the neck, status post stabilization with expected and resultant decreased range of motion; (2) minimal sciatica/lumbosacral intervertebral disc disease; (3) depression; and (4) excessive narcotic use. *Id.* Dr. Buekers concluded that plaintiff has no limitations in activities involving sitting, standing, walking, handling objects, hearing, speaking, or traveling, but only a "minimal limitation" in lifting or carrying heavy objects. *Id.*

## III.    PROCEDURAL HISTORY

Plaintiff filed an application for DIB on June 23, 2004. AT 38. The application was denied on August 20, 2004. AT 39-42. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on April 14, 2005. AT 193-203. On April 29, 2005, ALJ Harry H. Barr issued a decision finding that plaintiff was not disabled. AT 9-20. The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. AT 3-8.

## IV.    ADMINISTRATIVE LAW JUDGE'S DECISION

The Social Security Act (the "Act") authorizes payment of DIB and Supplemental Security Income to individuals with "disabilities." For both types of benefits, the Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

An ALJ must follow a five-step sequential evaluation process when considering a claim for disability benefits. 20 C.F.R. §§ 404.1520, 416.920; *see also Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). The determination of a claimant's request for benefits should therefore proceed as follows:

> At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (citations omitted).

In this case, the ALJ found at step one that plaintiff has not engaged in substantial gainful activity since the alleged onset date of disability. AT 13. At the second step, the ALJ determined that plaintiff's cervical spondylosis and depression were severe. AT 13-15. At the third step, the ALJ concluded that plaintiff's impairments neither met nor equaled any impairment listed in Appendix 1 of the Regulations. AT 15-16. At the fourth step, the ALJ found that plaintiff could lift and carry up to twenty pounds; sit, stand, or walk in any combination for full in an eight-hour

workday; and would function best performing simple tasks involving simple instructions. AT 16-18. Relying on the medical-vocational guidelines ("the grids") set forth in the Social Security regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ found that plaintiff was not disabled and denied her application for DIB benefits. AT 18-19.

## V.    DISCUSSION

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence" or when a decision is based on legal error. 42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citations omitted). As noted, the Court also reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard. *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).

Plaintiff argues (1) that the ALJ improperly disregarded the treating physician's opinion in favor of the consulting physician's opinion; (2) the ALJ improperly discounted plaintiff's complaints of disabling pain and functional limitations; (3) the ALJ improperly determined plaintiff's residual functional capacity ("RFC"); (4) the ALJ improperly utilized the grids; and (5) no purpose would be served by remand.

### A.    Treating Physician Rule

In this case, the ALJ determined that the opinion of Dr. Costello, a treating physician, was entitled to no weight. AT 17. The ALJ then found that the opinion of consultative examiner, Dr. Buekers, was entitled to "significant" weight. AT 18. Plaintiff argues that both determinations were erroneous. Dkt. No. 5 at 9-12.

An ALJ's evaluation of a treating doctor's medical opinion is governed by the "treating

physician rule." 20 C.F.R. § 404.1527(d)(2).  As specified in the regulations, the opinion of the

claimant's treating doctor is considered controlling as to the nature and severity of a claimant's

impairment, provided it is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence . . . ."  20 C.F.R.

§ 404.1527(d)(2); *see also Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998).  A treating

physician's opinion is binding unless contradicted by other medical evidence or by

"overwhelmingly compelling" non-medical evidence.  *Brown v. Apfel*, 991 F. Supp. 166, 171

(W.D.N.Y. 1998).

When substantial evidence in the record conflicts with a treating physician's opinion, that

opinion will not be given controlling weight.  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

However, under the applicable regulations, the Administration is required to explain the weight it

gives to the opinions of a treating physician.  *See* 20 C.F.R. § 404.1527(d)(2) ("We will always

give good reasons in our notice of determination or decision for the weight we give your treating

source's opinion.").  In determining the authoritative value of a non-controlling medical opinion,

the ALJ must consider: (1) the frequency of examination and the length, nature, and extent of the

treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency

with the record as a whole; (4) whether the opinion is from a specialist; and (5) any other relevant

factors.  *Id.*; *see also Schaal*, 134 F.3d at 503.  Omission of this analysis is considered failure to

apply the proper legal standard, and is grounds for reversal of the Commissioner's determination.

*Schaal,* 134 F.3d at 505.

### 1.      Dr. Costello

In this case, the ALJ concluded that Dr. Costello's opinion, as set forth in the medical

assessment, was entitled to no weight.  AT 17.  The ALJ explained that the assessment was

unsupported by Dr. Costello's own treatment notes and the record as a whole, and that the assessment itself offered little supporting evidence.  *Id.*  For the following reasons, the Court finds that the ALJ's determination is supported by substantial evidence.

First, as the ALJ found, Dr. Costello's opinion was unsupported by her own treatment notes.  *See* AT 17.  The ALJ pointed out that Dr. Costello's most recent examination of plaintiff, which was on January 28, 2005, fails to support the assessment.  AT 17.  During that examination, Dr. Costello noted that plaintiff "feels very good," is happy for the first time in five to six years, and "is starting to realize how depressed she *was*."  AT 159 (emphasis added).  She noted that plaintiff walks twice a day and is able to sleep through the night.  *Id.*  She also noted that plaintiff wants to cut back on pain medications and that she can go for hours without pain.  *Id.*  She further noted that plaintiff reported that her counselor feels that she is doing well.  *Id.*  The physical examination revealed a normal neck and joints.  AT 160.  As the ALJ noted, Dr. Costello made no recommendation restricting plaintiff's physical activities; instead she recommended that plaintiff try to decrease her use of OxyIR and return in three months.[8]  AT 17, 161.

The office notes documenting plaintiff's previous visits also provide little support for the assessment and suggest that plaintiff's condition improved.  On July 30, 2004, it was noted that plaintiff "feels better than she did when teaching" and that her depression was "much better."  AT 166.  Similarly on November 8, 2004, it was noted that plaintiff "feels good on Effexor."  AT 162.  While plaintiff's dosage of Effexor was later increased on December 8, 2004 for a short period of time, it was noted that plaintiff's father died recently.  *Id.*

---

[8]  To the extent that plaintiff argues that the ALJ erroneously noted that the medical assessment was based only on Dr. Costello's January 28, 2005 examination of plaintiff, Dkt. No. 5 at 10-11, the ALJ clearly stated that he examined the remainder of the record while evaluating Dr. Costello's opinion.  *See* AT 17.

The earlier progress notes also reflect that plaintiff walked and traveled. On January 28, 2005, Dr. Costello noted that plaintiff reported walking twice per day and on July 27, 2004, noted that plaintiff had stopped taking muscle relaxants and had been walking one mile every day. AT 159, 165. These notations are contrary to Dr. Costello's remarks in the assessment that plaintiff experiences pain if she walks more than three minutes at a time. AT 174. Moreover, on July 30, 2004, it was noted that plaintiff reported pain in her neck, shoulder, arms, and joints, but she had returned from a three-night trip, which involved a "long" car drive and sleeping on a futon. AT 166. Prior to the trip, plaintiff had stopped taking muscle relaxants and reduced her usage of pain medication. *Id.* It was also noted that plaintiff was planning upcoming trips to Canada and Rome. *Id.*

Second, as the ALJ found, Dr. Costello's assessment was unsupported by the record as a whole. *See* AT 17. During a follow-up visit with plaintiff's surgeon, Dr. Weingart, on February 28, 2002, it was noted that plaintiff "is doing well. She has noticed an improvement in her pain." AT 117. On examination, plaintiff had good strength, her incision was well healed, and the plate and grafts were in good position. *Id.* Similarly, consultative examiner, Dr. Buekers, concluded that plaintiff was in no acute distress. AT 145. Plaintiff's gait and stance were normal. *Id.* While her cervical spine flexion, extension, and lateral flexion were twenty degrees and rotary movement was twenty-five degrees, her thoracic spine was normal and her lumbar spine showed full flexion, extension, lateral flexion, and full rotary movement bilaterally. AT 146. Full ranges-of-motion were shown in plaintiff's shoulders, elbows, forearms, and wrists bilaterally, as well as her hips, knees, and ankles bilaterally. *Id.* Plaintiff's strength was 5/5 in the upper and lower extremities and there was no redness, heat, swelling, or effusion. *Id.* Plaintiff's hand and finger dexterity were intact and her grip strength was 5/5 bilaterally. AT 147. Dr. Buekers concluded

10

that plaintiff had no limitations in activities involving sitting, standing, walking, handling objects, hearing, speaking, or traveling, and only a "minimal limitation" in lifting or carrying heavy objects. *Id.*

Dr. Costello's assessment is further belied by plaintiff's own testimony. Plaintiff stated that she does not feel that "death is the answer[] anymore" and that she feels "a little bit hopeful. It's not like . . . this pain is so serious every minute of every day." AT 201. She also testified that she attends church and "things that are really important," and spent a holiday with her family. AT 202.

Third, as the ALJ noted, the assessment itself offers little in the way of supporting evidence. AT 17. For instance, Dr. Costello indicated that plaintiff should never perform postural activities, which included climbing, balancing, stooping, crouching, kneeling, and crawling. AT 176. However, when asked what medical findings support these restrictions, Dr. Costello provided no response. *Id.* Similarly, Dr. Costello indicated that plaintiff's abilities to reach, handle, feel, push, and pull were affected by her impairments, but cited no supporting medical findings. AT 177.

In sum, the ALJ properly rejected Dr. Costello's opinion. The ALJ's findings that the opinion was unsupported by Dr. Costello's own treatment notes and the record as a whole, and that the assessment itself offered little supporting evidence are supported by substantial evidence.

### 2.    Dr. Buekers

The ALJ found that the opinion of consultative examiner Dr. Buekers was entitled to "significant" weight. AT 18. Plaintiff argues that this determination was erroneous. Dkt. No. 5 at 11-12.

It is the responsibility of the ALJ to determine a claimant's RFC. 20 C.F.R. §

404.1546(c).  In deciding whether a claimant is disabled, medical opinions will "always" be considered regardless of their source.  20 C.F.R. § 404.1527(b), (d).  If any medical opinions are inconsistent with other evidence, the ALJ will weigh the evidence.  20 C.F.R. § 404.1527(c)(2). The report of a consultative physician may constitute substantial evidence.  *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (citations omitted).

In this case, the ALJ rejected Dr. Costello's opinion and assigned it no weight.  AT 17. The ALJ then assigned "significant weight" to Dr. Buekers's opinion, finding that it was consistent with his examination and other evidence in the record.  AT 18.  Indeed, Dr. Buekers's findings are generally consistent with Dr. Costello's own progress notes, Dr. Weingart's reports, and plaintiff's own testimony.  *See* AT 117-24, 144-48, 158-69, 201-02.  For instance, Dr. Costello's progress notes show an improvement in plaintiff's condition.  AT 158-69.  On January 28, 2005, Dr. Costello found that plaintiff "feels very good," that plaintiff walked twice a day, and that plaintiff's depression and sleep had improved.  AT 159.  Similarly, Dr. Weingart found that plaintiff's condition had improved.  AT 117.  Plaintiff's own testimony reflects improvement in her condition.  AT 201-02.  In any event, as noted, under the regulations, the ALJ was required to consider Dr. Buekers's medical opinion.  20 C.F.R. § 404.1527(b).  Accordingly, the ALJ committed no error by considering and assigning weight to Dr. Buekers's opinion.

**B.    Pain**

Plaintiff takes issue with the Commissioner's rejection of her complaints of disabling pain.  Plaintiff argues that the ALJ's references to her testimony were incorrect and that the ALJ improperly considered plaintiff's work history.  Dkt. No. 5 at 10-11.

When the evidence demonstrates a medically determinable impairment, "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive

clinical findings or other 'objective' medical evidence[.]" *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979) (citation omitted).  The ALJ, however, retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Id.*  When a claimant's testimony regarding pain suggests a greater severity of impairment than can be shown by objective medical evidence, the ALJ must consider the following factors in evaluating a claimant's symptoms and complaints of pain: (i) daily activities; (ii) the location, duration, frequency, and intensity of pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (v) treatment, other than medication, received for relief of pain or other symptoms; and (vi) any measures used to relieve pain or other symptoms.  *See* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).  When rejecting subjective complaints of pain, an ALJ must do so "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief[.]"  *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987).  If the Commissioner's findings are supported by substantial evidence, "the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted).

In rejecting plaintiff's complaints of disabling pain and limitations, the ALJ found that while plaintiff has medically determinable impairments that could reasonably be expected to produce some of the alleged symptoms, plaintiff's complaints were "out of all proportion to the objective medical evidence in the record." AT 17.  In making this determination, first, the ALJ discussed plaintiff's daily activities; the location, duration, frequency, and intensity of her pain;

precipitating and aggravating factors; the medications taken by plaintiff; and measures used to

relieve pain or other symptoms, which included lying down and taking hot baths and saunas.  AT

16-17.  The ALJ also noted that "it has been suggested that [plaintiff] overuses narcotic pain

medication."  AT 17.  Indeed, Dr. Buekers diagnosed plaintiff as suffering from "[e]xcessive

narcotic use."  AT 147.  Moreover, Dr. Costello noted on January 28, 2005 that plaintiff should

try to reduce her use of OxyIR.  AT 161.

Second, the ALJ pointed out the inconsistent nature of several of plaintiff's statements.

AT 16-17.  The Court notes that "[o]ne strong indication of the credibility of an individual's

statements is their consistency, both internally and with other information in the case record."

Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *5 (SSA 1996).  As an example, the

ALJ noted that in a Function Report dated August 8, 2004, plaintiff reported that she prepared no

meals because she is unable to stand for more than thirty minutes at a time.  AT 16; *see* AT 80.

However, in the same report, plaintiff asserted that she was unable to stand for more than three to

five minutes.  AT 82.  It is also noted that on December 12, 2003, Dr. Costello noted that plaintiff

reported cooking dinner on the weekend.  AT 169.

The ALJ also noted that plaintiff described her pain as follows:

> I have permanent muscle spasms in my neck.  My neck aches going up the back and
> sides of my skull, and going down from the base of my neck and upper shoulders over
> the top of my arm[,] [it] is all in a rock hard spasm, [and] the pain is excruciating.
> The pain radiates and shoots down both arms (front and back) all the way to my
> fingers.

AT 83.  However, as the ALJ noted, Dr. Costello's January 28, 2005 progress note and Dr.

Buekers's report contradict these claims.  AT 16; *see* AT 145-47, 159-61.  Upon examination, Dr.

Costello found that plaintiff's neck and joints were normal, and noted that plaintiff wanted to

reduce her usage of pain medications," can go for hours without pain, and "feels very good."  AT

14

159-60.  Similarly, Dr. Buekers found that plaintiff was in no acute distress, her neck was supple, and her shoulders, elbows, forearms, and wrists bilaterally showed full ranges-of-motion.  AT 145-46.  Plaintiff's strength was 5/5 in the upper extremities and there was no redness, heat, swelling, or effusion.  AT 146.  Plaintiff's hand and finger dexterity were intact and her grip strength was 5/5 bilaterally.  AT 147.

Additionally, plaintiff testified that she was unable to travel.  AT 202.  However, Dr. Costello noted on July 30, 2004 that plaintiff took a three-night trip which involved a "long car drive" and sleeping on a futon.  AT 166.  She also noted that plaintiff was planning to go to Canada a few days later and was planning a trip to Rome.  *Id.*  It is also noted that plaintiff testified at the hearing held on April 14, 2005 that it had been "years" since she socialized outside of her house.  AT 198.  However, in the Function Report dated August 4, 2004, plaintiff reported that if her neck is "doing well," she attends social gatherings, political gatherings, and the movie theater on a regular basis.  AT 81.  Moreover, Dr. Buekers noted in his report completed the same day that plaintiff stated that she "goes out to socialize with friends."  AT 145.

Third, the ALJ pointed out that following neck surgery in January of 2002, plaintiff received conservative treatment of her neck.  AT 17.  Indeed, Dr. Costello's progress notes contain few references to plaintiff's neck.  *See* AT 158-69.  While her notes document plaintiff's complaints of neck pain on July 30, 2004, it was noted that plaintiff had returned from a three-night trip which involved a "long car drive" and sleeping on a futon.  AT 166.  Prior to the trip, plaintiff had stopped taking muscle relaxants, reduced her usage of pain medications, and was walking one mile every day.  AT 165-66.  The next reference to plaintiff's neck in Dr. Costello's treatment notes is from the January 28, 2005 examination during which Dr. Costello found that plaintiff's neck and joints were normal, and noted that plaintiff "feels very good" and can go for

15

hours without pain.  AT 159-60.

Fourth, the ALJ cited plaintiff's ability to return to work following her surgery.  AT 17.

While plaintiff argues that she "should not be penalized" because she attempted to continue

working, Dkt. No. 5 at 15, the regulations require that an ALJ "consider all of the evidence

presented, including information about your prior work record."  20 C.F.R. § 416.929(c)(3); *see*

*also* SSR 96-7p, 1996 WL 374186, at *5.  While an ALJ must consider a claimant's prior work

record, "work history is just one of many factors that the ALJ is instructed to consider in

weighing the credibility of [a] claimant['s] testimony."  *Schaal*, 134 F.3d at 502.  Accordingly,

the ALJ was obligated to consider plaintiff's prior work record, which he did.  The ALJ reviewed

plaintiff's work history in some detail, specifically noting that plaintiff returned to work as a

teacher following her neck surgery and that plaintiff received "special accommodations" at her

school.  AT 13-17.  However, as reflected in the ALJ's decision, plaintiff's work record was just

one of many factors the ALJ considered in evaluating her credibility.  As previously discussed,

the ALJ also considered plaintiff's daily activities; the location, duration, frequency, and intensity

of

plaintiff's symptoms; precipitating and aggravating factors; the medications taken by plaintiff; and

measures taken to relieve symptoms.  AT 16-17.  Therefore, the ALJ committed no error by

considering plaintiff's work history.

Fifth, the ALJ also considered that the medical record provides no indication that

plaintiff's neck surgery was unsuccessful.  AT 17.  Plaintiff argues that this was an incorrect

determination, as evidenced by her need for special accommodations at her place of employment

and by subsequent x-rays of her hands.[9]  Dkt. No. 5 at 14-15.  Plaintiff fails to explain clearly how the special accommodations and subsequent x-rays of her hands establish that her neck surgery was unsuccessful.  Moreover, in a report describing the surgery, Dr. Weingart noted that the anterior cervical plate was placed "without difficulty.  There was excellent fixation of all screws . . . [and] the plate [was] in good position."  AT 122.  During a follow-up visit, Dr. Weingart gave no indication that the surgery was unsuccessful.  AT 117-18.  Dr. Weingart noted, "Overall [plaintiff] is doing well.  She has noticed an improvement in her pain . . . . On exam, she has good strength.  Her incision is well healed."  AT 117.  The plate and grafts were in good position.  *Id.*  Thus, this claim is unavailing.

As the foregoing demonstrates, the ALJ discussed the relevant factors set forth in the regulations in determining plaintiff's credibility, and additionally pointed out the inconsistent nature of plaintiff's claims, the conservative treatment received, plaintiff's ability to return to work following her surgery, and the lack of evidence suggesting that plaintiff's neck surgery was unsuccessful.  Accordingly, the Court concludes that the ALJ's credibility finding is supported by substantial evidence.

### C.    Residual Functional Capacity

Plaintiff challenges the RFC determination, arguing that she is unable to work for sustained periods, and that the ALJ failed to consider plaintiff's complaints of pain.  Dkt. No. 5 at 16-19.

RFC is defined as:

"what an individual can still do despite his or her limitations . . . .  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an

---

[9]  An x-ray of plaintiff's right hand taken on September 3, 2003 showed "mild osteoarthritic change in the distal interphalangeal joints."  AT 129.  An x-ray of plaintiff's left hand taken on the same day showed the same result, as well as a "small metallic foreign body adjacent to the [second] proximal phalanx."  AT 128.

ordinary work setting on a regular and continuing basis, and the RFC assessment must
include a discussion of the individual's abilities on that basis. A 'regular and
continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work
schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2)

(SSA July 2, 1996)).  In making a residual functional capacity determination, the ALJ must

consider a claimant's physical abilities, mental abilities, and symptomology, including pain and

other limitations which could interfere with work activities on a regular and continuing basis.  20

C.F.R. § 404.1545(a).

In this case, the ALJ determined that plaintiff has the RFC to lift and carry up to twenty

pounds; sit, stand, or walk in any combination for full in an eight-hour workday; and would

function best performing simple tasks involving simple instructions.  AT 16.  Based on these

findings, as well as plaintiff's age, educational background, and work experience, the ALJ

referenced the grids, and concluded that plaintiff was not disabled.  AT 18-19.

Plaintiff argues that she is unable to work for sustained periods, as demonstrated by her

inability to work at her former job which provided "special accommodations" to her.  Dkt. No. 5

at 18.  Plaintiff fails to specify what "special accommodations" were provided.  Moreover, the

record suggests that plaintiff's condition improved after plaintiff filed for disability benefits on

June 23, 2004.  *See* AT 38.  For instance, on November 8, 2004, Dr. Costello noted that plaintiff

"feels good on Effexor," which is medication that plaintiff herself reported she took for pain.  AT

64, 162; *see* AT 86.  Similarly, on January 28, 2005, Dr. Costello noted that plaintiff "feels very

good," that plaintiff is happy for the first time in five or six years, and that plaintiff walks twice a

day, is able to sleep through the night, wants to cut back on pain medications, and can go for

hours without pain.  AT 159.  Moreover, plaintiff's own testimony suggests that she was no

longer taking pain medication and that her condition improved.  AT 201-02.  While plaintiff also

cites to Dr. Costello's functional assessment as demonstrating her inability to work for sustained periods, the Court has already concluded that the ALJ properly assigned no weight to that assessment. *See* Part V.A.

Plaintiff also argues that the ALJ failed to consider her complaints of pain. Dkt. No. 5 at 18-19. However, the ALJ's decision reflects that the ALJ discussed plaintiff's allegations of pain and limitations at length and made a determination that she was not entirely credible. *See* AT 16-19. As previously discussed, that determination is supported by substantial evidence. *See* Part V.B. Thus, this claim is unavailing. Accordingly, the RFC determination is supported by substantial evidence.

### D.    Vocational Expert

Plaintiff argues that the ALJ improperly utilized the grids while determining that plaintiff was not disabled. Dkt. No. 5 at 19-21. She claims that the ALJ should have obtained testimony from a vocational expert. *Id.*

At step five of the sequential evaluation process, the burden shifts to the Commissioner to establish that the plaintiff "retains a residual functional capacity to perform . . . substantial gainful work which exists in the national economy." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). Ordinarily, the ALJ need not consult a vocational expert, and may satisfy this burden "by resorting to the applicable medical vocational guidelines (the grids)." *Id.* (citing 20 C.F.R. Pt. 404, Subpt. P, App.2). The grids, however, do not provide the exclusive framework for making a disability determination if a claimant suffers from non-exertional impairments that "significantly limit the range of work permitted by exertional limitations." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Bapp*, 802 F.2d at 604-05 (citation omitted)). Work capacity is "significantly diminished" if there is a loss of work capacity that narrows the possible range of work available

and deprives the claimant of a meaningful employment opportunity.  *Bapp*, 802 F.2d at 605.

Thus, the "mere existence of a non-exertional impairment does not automatically require the

production of a vocational expert nor preclude reliance on the guidelines."  *Id.* at 603.  Non-

exertional limitations include difficulty functioning due to depression.  20 C.F.R. §§

404.1569a(c)(1)(i), 416.969a(c)(1)(i).

In this case, the ALJ utilized the grids to determine that plaintiff was not disabled.  AT 18-

19.  However, plaintiff argues that the ALJ should have obtained the testimony of a vocational

expert due to her non-exertional impairments, which included "chronic and disabling pain as well

as depression."  Dkt. No. 5 at 20.  Plaintiff claims that these conditions were "noted by all

medical providers."  *Id.*

Regarding plaintiff's "chronic and disabling pain," as previously determined, there is

substantial evidence to support the ALJ's discounting of plaintiff's subjective complaints of pain.

Part V.B.  Indeed, the medical evidence provides no indication that plaintiff's work capacity was

significantly diminished by pain.  As noted, Dr. Costello found on January 28, 2005 that plaintiff

"feels very good," is happy for the first time in five or six years, walks twice a day, is able to

sleep through the night, wants to reduce her pain medication, and can go for hours without pain.

AT 159.  Similarly, Dr. Buekers found that plaintiff had no limitations in her abilities to sit, stand,

walk, handle objects, hear, speak, or travel.  AT 147.  He found that plaintiff had only a "minimal

limitation" involving lifting or carrying heavy objects.  *Id.*  Plaintiff herself testified that she feels

"It's not like . . . this pain is so serious every minute of every day."  AT 201.  Accordingly,

plaintiff's claim is unavailing.

Similarly, regarding plaintiff's depression, there is no indication that plaintiff's work

capacity was significantly diminished by depression.  While plaintiff was diagnosed as suffering

from depression and prescribed an antidepressant, *see* AT 169, the mere presence of a disease or

impairment is insufficient; rather the claimant must show that the disease or impairment has

caused functional limitations that preclude her from engaging in any substantial gainful activity.

*See Rivera v. Harris*, 623 F.2d 212, 215-16 (2d Cir. 1980).  Moreover, the record suggests that

plaintiff's depression improved.  Dr. Costello's notes state that on July 30, 2004, plaintiff "feels

better than she did when teaching" and that her depression was "much better."  AT 166.  On

November 8, 2004, it was noted that plaintiff "feels good on Effexor."  AT 162.  While plaintiff's

dosage of Effexor was later increased for a short period of time, it was noted that plaintiff's father

died recently.  *Id.*  On January 28, 2005, plaintiff herself reported that her depression was

"better."  AT 158.  On the same date, Dr. Costello noted that plaintiff "feels very good," is happy

for the first time in five or six years, walks twice a day, and is able to sleep through the night.  AT

159.  She also noted that plaintiff is "starting to realize how depressed she *was*," and that

plaintiff's "counselor . . . feels she is doing well."  *Id.* (emphasis added).  Therefore, this

contention is without merit.

In sum, the ALJ committed no error by utilizing the grids in determining that plaintiff was

not disabled.  The record provides no indication that plaintiff's work capacity was significantly

diminished by pain and depression.

**VI.    CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits be **AFFIRMED**; and it is further

**ORDERED** that defendant's motion for judgment on the pleadings (Dkt. No. 9) is

**GRANTED**; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that plaintiff's complaint (Dkt. No. 1) is **DISMISSED**.

**IT IS SO ORDERED.**

Dated: October 8, 2008
        Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge

22